**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

**DAVE W. SHINGLES, JR.**

    **Plaintiff,**

**vs.**                                            **No.**     3:21cv028-SA-JMV

**BRIAN ROSENBERG. Individually and
CITY OF SOUTHAVEN, MISSISSIPPI**      **JURY DEMANDED**

    **Defendants**

## COMPLAINT

COMES NOW Plaintiff DAVE W. SHINGLES, Jr. ("Officer Shingles") who brings this action by and through undersigned counsel, and files this complaint for tortious interference with a contract, as well as violation of 42 U.S.C. § 1981 *et seq.* against the Defendants, Brian Rosenberg ("Rosenberg") in his individual capacity, and City of Southaven, Mississippi, ("Southaven") and states as follows:

### INTRODUCTORY STATEMENT

Plaintiff, an African American male citizen of the United States seeks redress for tortious interference of a contract against Defendant Rosenberg, in his individual capacity as he acted outside the scope of his employment with malice, by singling Officer Shingles out on several occasions for the purpose of having Officer Shingles terminated. Defendant Rosenberg fabricated falsehoods that he knew to not be true and presented these to his supervisor(s) in bad faith with the intention of getting Officer Shingles terminated. Officer Shingles also seeks redress for racial

1

discrimination as he was not treated the same as white police officers were treated, under the same or similar circumstances, who worked with Southaven Police Department.

## PARTIES

1. Plaintiff, Dave W. Shingles Jr. ("Officer Shingles"), is an adult male citizen of the United States and at all times material hereto has been a resident of Memphis, Shelby County, Tennessee.

2. Defendant, Brian Rosenberg ("Defendant Rosenberg") is employed as a police officer with the Southaven Police Department at all times pertinent to this action and may be served at 8691 Northwest Drive, Southaven, Mississippi 38671.

3. Defendant, City of Southaven ("Southaven"), is a municipal entity, located in DeSoto County, Mississippi, recognized by the State of Mississippi as a properly organized and legal municipal entity under charter granted by the State of Mississippi which, among other things, operates a police department called the Southaven Police Department. (Hereinafter "Southaven" and/or "City of Southaven"). The City of Southaven may be served through the Office of the Mayor, Darren Musselwhite, located at 8710 Northwest Drive, Southaven, Mississippi 38671.

## JURISDICTION AND VENUE

4. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(4) in so far as Plaintiff's claims raise a substantial federal question pursuant to 42 U.S.C. § 1981. Jurisdiction is conferred on this Court as this cause of action presents a question of federal law. This court has personal jurisdiction as the Plaintiff worked in Southaven, Mississippi, the acts and actions giving rise to this lawsuit occurred in Mississippi, and Defendants are located in Southaven, Mississippi.

5. Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391(c) since the Defendants may be found in this Judicial District, as they either reside in or do business in this district, and the facts and circumstances which give rise to the causes of action contained in this Complaint occurred in DeSoto County and this judicial district, the Northern District of Mississippi. Additionally, venue is proper pursuant to 28 U.S.C. 1392, because the Defendant, City of Southaven, is located in this district.

6. This Court has the authority to grant declaratory relief pursuant to the Federal Declaratory Judgment Act ("DJA") 28 U.S.C. §§ 2201-02.

## FACTS

7. Plaintiff, Dave W. Shingles, Jr., is an African American male who began his career in law enforcement as a police officer for the City of Olive Branch, Mississippi in February 2006.

8. Officer Shingles began his employment as a police officer with the City of Southaven on August 28, 2014. As a Police Officer with City of Southaven, Officer Shingles had a property right in continued employment with the City of Southaven at the time of his termination in April 2020.

9. During his approximate fourteen (14) year career in law enforcement, Officer Shingles actively participated in and saw the benefits of community policing.

10. Community policing involves officers creating bonds with the citizens in their ward on a regular basis. Officers interact with the citizens they protect in a personal way by talking to them and getting to know them.

11. Officer Shingles was actively involved in community policing during his employment with the City of Southaven, and he had always been encouraged to continue to actively pursue community policing.

12. As an example, while an officer with the Southaven Police Department, Officer Shingles engaged in community policing by feeding and mentoring children at a Southaven high school. He routinely went to the school prior to the school day beginning, providing food to middle and high school students who typically did not receive breakfast at home. He fed impoverished kids every summer at the section 8 housing development, South Park Apartments. He often took young white officers with him to teach them how to connect with the community and win the respect and love of other ethnic and racial groups. He also mentored young white officers on patrol by taking them around to different businesses and introducing them to show them how to connect with the community.

13. During his employment with the Southaven Police Department, Officer Shingles received many verbal and written commendations, as well as being mentioned in the local newspaper, for his community policing efforts.

14. In July 2019, Macon Moore ("Moore") was hired as the Chief of Police for Southaven. Following his hiring, Moore made an appearance at a roll call wherein Officer Shingles was in attendance, and Moore told the officers that he wanted to encourage community policing in Southaven. Moore specifically told the Southaven police officers to be more "professional and visible in the community."

15. Following roll call, Officer Shingles made a point to introduce himself to Chief Moore wherein they discussed community policing and Officer Shingles' thoughts as to furthering community policing. Chief Moore encouraged Officer Shingles to not only continue his community policing, but also encouraged him to further his efforts.

16. Officer Shingles had never been disciplined for community policing.

17. In March 2020, the City of Southaven, just like all other cities throughout the United States, had in place various restrictions and curfews that greatly limited the movement of its citizens due to COVID-19.

18. On March 16, 2020, the City of Southaven enacted a set of policies to address COVID-19. Among other things, the officers were to maintain social distancing by maintaining at least a six - foot distance from all persons when the situation allows. Also, officers were to wear appropriate personal protective equipment (PPE)- masks. However, the masks were to be used by officers in situations where a subject had advised that he/she had symptoms of COVID-19.

19. The Southaven Police Department COVID-19 policy addressed decontamination of patrol cars, setting forth a specific criteria and process for decontamination of patrol cars.

20. Just days after the COVID-19 policy was put in place, the officers were served pizza, buffet style in the booking area, the same way they had always eaten pizza and food that had been donated by the public, in direct violation of the department COVID-19 policy. Officers did not wash their hands or use sanitizer but just grabbed a slice of pizza. Southaven supervisors were present and said nothing about the failure to follow the COVID-19 policy.

21. On the night of March 29, 2020, around 11:00 pm, Officer Shingles was patrolling his ward, when he saw two individuals appearing to be playing basketball beside Oak Forest Church, located at Getwell Road and Plum Point Road. This area is a well-maintained part of Southaven, and an area where a reasonable person would expect low crime rate. Because it was after the Southaven COVID-19 imposed curfew, Officer Shingles felt it necessary that he speak directly with the individuals.

22. Because of the COVID-19 restriction there was little, if any, vehicle traffic in Southaven that night (March 29, 2020). Everything was closed and there was very little going on in the city that night.

23. When Officer Shingles drove back to the basketball court in the parking lot at Oak Forest Church, he saw that the two individuals were local African American male collegiate athletes who appeared to simply be playing a game of one-on-one basketball.

24. Officer Shingles radioed dispatch and told them that he would be beside Oak Forest Church talking with two young men who were shooting basketball. Because of the location of the basketball court, Officer Shingles and the two young collegiate athletes, were visible from Getwell Road.

25. Officer Shingles approached the two young men to speak with them regarding their being out after curfew. Officer Shingles learned that the two young men were almost through with their game of one-on-one, so he waited as they finished. After the game finished, Officer Shingles took the opportunity to speak with and mentor the two young men, discussing their lives, educations, etc. In short, Officer Shingles was community policing.

26. During the time Officer Shingles spoke with the two young men he was wearing his PPE and he maintained the six (6) foot social distancing rule as required by the City of Southaven policy. While they talked each of the men intermittently dribbled a basketball.

27. Officer Shingles was not "playing" basketball or "performing basketball maneuvers". Officer Shingles was wearing his full uniform, radio, bullet-proof vest, and gun belt during the entire time he spoke with the two young men. Further, while speaking with the young men, Officer Shingles had his radio on and was monitoring radio traffic.

28. While Officer Shingles was speaking with the two young men, Defendant Rosenberg pulled up to the location. Defendant Rosenberg was recently promoted to lieutenant and his sudden appearing at the church was highly irregular. Officer Shingles walked over to Defendant Rosenberg and Defendant Rosenberg stated that he was "coming to check on" Officer Shingles. Defendant Rosenberg told Officer Shingles that he (Officer Shingles) had been quiet on the radio and that he (Officer Shingles) was out with two "suspicious characters" who were both African American.

29. Officer Shingles asked Defendant Rosenberg if "everything was ok", and Rosenberg answered "yes." Rosenberg never said anything about Officer Shingles intermittently bouncing a basketball or the COVID-19 policy.

30. Officer Shingles had not missed a call, had told dispatch what he was doing, and had not used the term "suspicious characters" in referring to the two African American college students who were playing one-on-one basketball. Officer Shingles simply told dispatch that he was going to speak with two young men who were playing basketball after curfew.

31. There was no legitimate police reason for Defendant Rosenberg to come to the location as Officer Shingles was not in danger and Officer Shingles had made it clear when he communicated with dispatch that he was going to take a few minutes and "speak" with these two young men.

32. Defendant Rosenberg's "checking on" Officer Shingles was highly unusual, and not within the City of Southaven police policy as Officer Shingles had clearly advised dispatch that he would be community policing for a few minutes. Defendant Rosenberg was intentionally following Officer Shingles with the malicious and bad faith intent to "write up" Officer Shingles so that he, Defendant Rosenburg, could put something derogatory in Officer Shingles file.

7

33. Defendant Rosenberg, as a lieutenant and supervisor, was at the station and if Officer Shingles had needed backup due to the "suspicious characters" as defined by Defendant Rosenberg, under City of Southaven police policy, an officer on patrol and in the vicinity or neighborhood would have been a more reasonable person to come by to check on Officer Shingles.

34. Defendant Rosenberg had been showing a pattern of singling out Officer Shingles for no apparent valid reason. On four or five other occasions, Defendant Rosenberg singled out Officer Shingles in bad faith by following him around looking for a reason to write him up.

35. Following the March 29, 2020 event, Defendant Rosenberg ordered Officer Shingles to prepare a "memo" for his personnel file to address and document his speaking with the two young men that night.

36. For some period of time, Southaven police department supervisors had been requiring Officer Shingles to self-write a "memo" for his personnel file to record various acts or omissions.

37. On April 1, 2020, Officer Shingles was told by Sergeant Rico Harris that the officers were going to choose the ward they wanted to work. The white officers were given first choice of the ward they wanted to work even though many had less seniority than Officer Shingles while Officer Shingles was told what ward he would be going to work. Thereafter, Officer Shingles was moved by the City of Southaven Police Department management to a ward that he did not want to work while his similarly situated white officers were allowed to pick their ward. Upon information and belief, Officer Shingles was treated this way on account of his race, African American.

38. On April 1, 2020, Officer Shingles investigated a shoplifting event at Wal-Mart and subsequently arrested a seventy (70) year-old man for shop lifting. The recently enacted COVID-

8

19 policy set forth that the booking officer was to write up the incident report - not the arresting officer, (Officer Shingles).

39. At the beginning of most shifts, the supervisors remind the officers to finish and turn in any incomplete reports or reports that were not done from the previous day. It is common for officers to complete reports or write reports from the previous day prior to or during their shift. Not only are officers not disciplined for this, but they are also never terminated for this.

40. On April 2, 2020, Officer Shingles was told to complete a report regarding the Wal-Mart shop lifting incident. Because Officer Shingles was preparing the incident report the day after the arrest, Defendant Rosenberg, in bad faith, and stepping outside of the scope of his duty, jumped on the opportunity to instruct Officer Shingles to fill out a "memo" for his personnel file which was subsequently used by Defendant Rosenberg to get Officer Shingles terminated.

41. During April 2020, Officer Shingles worked 2nd shift and "shared" a patrol car with 1st shift patrol officer, Officer Godwin. Officer Shingles patrolled 2nd shift with the same patrol car that had been driven by Officer Godwin on 1st shift.

42. On April 6, 2020, it became common knowledge at Southaven Police Department that Officer Godwin had been exposed to COVID-19 as his wife had tested positive that day for COVID-19. Southaven did not remove Officer Godwin from his shift or require that he be tested for COVID-19, which violated its COVID-19 policy.

43. On April 6, 2020, the very same day, Officer Shingles attended roll call, which was held outside in the parking lot due to COVID-19. As Officer Shingles walked to his patrol car that evening, several Southaven Police Department officers informed him that Officer Godwin had been in that car all day and that his wife had tested positive for COVID-19.

44. Because Officer Shingles was scheduled to drive the patrol car Officer Godwin had been driving all day, Officer Shingles asked his supervisors about his being assigned to this car; his supervisors never replied. Officer Shingles sent a text message to his supervisor at 6:42 pm, regarding his use of the patrol car. The supervisor never replied.

45. Defendant Rosenberg was the supervisor in charge and the one who forced Officer Shingles to drive the possibly COVID-19 infected patrol car for his 12-hour shift. Defendant Rosenberg violated the Southaven COVID-19 policy by not taking the patrol car out of usage and by not having it decontaminated per the written policy.

46. Following Officer Shingles' use of the potentially COVID-19 infected car, Officer Shingles was told by a supervisor, Sergeant Rico Harris, to get tested for COVID-19.

47. Defendant Rosenberg was aware of Officer Godwin's wife testing positive for COVID-19 that day, and that the COVID-19 policy required that the car was to be properly cleaned; however, Defendant Rosenberg ignored the Southaven COVID-19 policy and required Officer Shingles to drive the possibly infected car the entire shift.

48. On April 12, 2020, Officer Shingles began experiencing tightness in his chest and exhibiting symptoms that are currently being recognized as potentially COVID-19.

49. Officer Shingles was not treated the same as white officers had been treated regarding COVID-19.

50. Officer Shingles was not allowed to miss work because of his possibly being infected by COVID-19.

51. Approximately two weeks before Officer Shingles' being required to drive a patrol car which had been possibly exposed to COVID-19, a white officer, Daniel Moore, had a possible exposure to COVID-19 as well. Moore's wife treated a patient with COVID-19, and when Moore

10

told Defendant Rosenberg of this, Moore was sent home. Defendant Rosenberg did not treat Officer Shingles as he did Officer Moore, Shingles similarly situated white coworker.

52. Following the April 12, 2020 event, and his failure to follow the COVID-19 policy, Defendant Rosenberg stepped outside the scope of his employment again and acted in bad faith to willfully, intentionally, and maliciously mislead Chief Moore as to the facts surrounding the March 29, 2020 basketball event as well as the April 1, 2020 Wal Mart shoplifting event, for the purpose of having Officer Shingles terminated.

53. On April 21, 2020, Officer Shingles was told to meet with Chief Moore. At the very outset of the meeting, Chief Moore told Officer Shingles that at that time he was being written up for two things: playing basketball and not taking a report. The "not taking a report" is referring to the Wal Mart shoplifting arrest of April 1, 2020.

54. On April 21, 2020, Chief Moore told Officer Shingles that he (Moore) was going to recommend to the Southaven Board of Aldermen, at their next meeting - the next day - that Officer Shingles be terminated, as he had the worst personnel file of anyone he had ever seen. Chief Moore's recommendation that Officer Shingles be fired, was because of the number of "write ups" in his file. These "write-ups" were the "memos" that Officer Shingles had been required by supervisors to prepare.

55. During his employment as a police officer for Southaven, Officer Shingles had from time to time, been ordered by a supervisor to "write up" a "memo" for his personnel file to explain some event. Officer Shingles was told that these "write ups" would be an explanation as to why something had not been timely done or to explain some act or omission.

56. Officer Shingles was told that these "write-ups" were not disciplinary but were instead harmless and were not used against the officer.

57. In Officer Shingles' case, write-ups written by supervisory officers were written in bad faith to build his file for his termination. In one such instance in January 2020, Officer Shingles was called out on a stolen vehicle case. Officer Shingles informed his supervisor that the car had not been stolen - that the car had been driven out of the garage by a young person living in the household for the purpose of "joy riding". The parents thought that the car had been stolen. The young person had returned between the time the car had been reported stolen and Officer Shingles' arrival. The supervisor told him "good job and thanks". The supervisor did not request that Officer Shingles complete a stolen vehicle report. Nevertheless, Officer Shingles was later written up by Lt. Scallorn for not having completed a stolen vehicle report for a car that was not stolen. White officers were not treated this way.

58. Officer Shingles was terminated based on the number of "write-ups" in his file.

59. Southaven Human Resource director, Chris Wilson, has told white officers, during their exit interviews that the "write ups"/memos are harmless and are not used against the officer.

60. White officer, Brad Knox, had 14 "memos" from one supervisor, yet he was not disciplined in any manner for this.

61. White officers for Southaven Police Department refused to self-prepare "memos" or "write-ups"; they were not disciplined in any manner for this, let alone terminated for it.

62. Officer Shingles was not treated the same as white officers.

63. Officer Shingles was terminated for community policing with two African American college athlete basketball players; however, white officers have been treated differently.

64. Two white officers, Cory and White, were at South Park Apartments playing football with a group of people while on duty. Officers Cory and White missed several radio calls,

12

and were off the radio for a considerable amount of time. Officers Cory and White were not disciplined for playing football and ignoring their radios while on duty.

65. Following the wrongful termination, Officer Shingles filed for unemployment, which was initially granted by the State of Mississippi.

66. Following the ordering of unemployment being paid, Chris Wilson (Wilson) and others associated with Southaven undertook acts against Officer Shingles to sabotage his unemployment.

67. Even though Chief Moore specifically told Officer Shingles that he was being written up for playing basketball on duty and not timely taking a report, Wilson created documents to allow Southaven to argue that Officer Shingles was terminated for violating the Southaven COVID-19 policy rather than the reason stated by Chief Moore, playing basketball while on duty.

68. At no time did Chief Moore ever mention any violation of the Southaven COVID-19 policy by Officer Shingles during the April 21, 2020 meeting. Wilson intentionally and willfully fabricated a lie that Officer Shingles was terminated because he violated the COVID-19 policy.

69. During the unemployment appeal hearing, Wilson argued that the basis for Officer Shingles' termination was his violation of the Southaven COVID-19 policy, even though he knew this to be false.

70. The first time Defendant Southaven raised or brought up that Officer Shingles had violated the COVID-19 policy was during Wilson's argument to the Mississippi Department of Employment during Officer Shingles' unemployment appeal hearing on September 23, 2020.

71. At no time during the April 21, 2020 meeting with Chief Moore, did Chief Moore ever discuss COVID-19 in any manner, let alone in the context of Officer Shingles being terminated for a violation of this policy.

72. Wilson has fabricated documents, has lied under oath to the Mississippi Department of Labor, and has taken retaliatory action against Officer Shingles.

73. The Mississippi Department of Employment, relying solely on Wilson's lie, overturned its award of unemployment as to Officer Shingles and has ordered that he repay approximately $12,000.00 in unemployment.

## CAUSES OF ACTION

### COUNT ONE
### DEFENDANT ROSENBERG
### TORTIOUS INTERFERENCE WITH CONTRACT

74. Plaintiff re-avers and incorporates paragraphs 1 – 73 above as if fully set forth herein.

75. Officer Shingles was a police officer with the City of Southaven and had a property right in continued employment with Southaven at the time of his termination in April 2020.

76. The actions of Defendant Rosenberg, acting outside the scope of his employment in getting Officer Shingles fired were both intentional and malicious, and outside the scope of his employment.

77. The actions of Defendant Rosenberg were done specifically to cause damage to Officer Shingles by getting him fired.

78. The acts and actions of Defendant Rosenberg were done for the purpose of causing the termination of Officer Shingles and were not justifiable.

79. As a result of Defendant Rosenberg's illegal and intentional actions, Officer

Shingles was fired.

80. As a result of Defendant Rosenberg's illegal and intentional actions, Officer Shingles has been made to suffer mental anguish and emotional distress, loss of employment and future employment opportunities, loss of wages and benefits, humiliation, irreparable loss of enjoyment of life, emotional distress, and loss of job-related benefits as the direct and proximate result of respondent's tortious interference with his employment with the City of Southaven. Officer Shingles is reasonably certain to continue to suffer these damages in the future.

## COUNT TWO
### RACE DISCRIMINATION – CITY OF SOUTHAVEN and DEFENDAT ROSENBERG (Disparate Treatment) in Violation of 42 U.S.C.A § 1981 *et. seq.*

81. Plaintiff re-avers and incorporates paragraphs 1 – 80 above as if fully set forth herein.

82. The subjection of Officer Shingles to disparate treatment and adverse employment actions by defendant City of Southaven and Defendant Rosenberg individually in whole or substantial part because of his race African American was in violation of 42 U.S.C § 1981 *et. seq*.

83. During the past several years, Defendants have willfully and intentionally violated Section 1981.

84. Officer Shingles has been the victim of unlawful discriminatory conduct in the workplace. He was unlawfully subjected to disparate treatment and suffered adverse employment actions by defendant on the basis of his race. These employment actions were unlawful in violation of 42 U.S.C. § 1981.

85. As a result of Defendants' illegal and intentional actions, Officer Shingles has been made to suffer mental anguish and emotional distress, loss of employment and future employment opportunities, loss of wages and benefits, humiliation, irreparable loss of enjoyment of life,

emotional distress, and loss of job-related benefits as the direct and proximate result of respondent's violations of his civil rights as alleged herein. Officer Shingles is reasonably certain to continue to suffer these damages in the future. Officer Shingles is entitled to the rights and remedies at law provided by 42 U.S.C. § 1981 *et. seq.*, including actual damages, compensatory damages, punitive damages, and attorneys' fees.

## COUNT THREE
## DUE PROCESS VIOLATION– CITY OF SOUTHAVEN
**Violation of Plaintiff's Fourteenth Amendment Rights Under 42 U.S.C.A § 1983 *et. seq.***

86. Plaintiff re-avers and incorporates paragraphs 1 - 85 above as if fully set forth herein.

87. Defendant Southaven terminated Officer Shingles' employment without procedural Due Process of Law in violation of the 14th amendment by terminating him without a hearing.

88. Officer Shingles had a constitutionally protected property interest in his employment. Officer Shingles was not given notice and an opportunity to respond before the termination took effect.

89. Officer Shingles was told by the Southaven Police Department that on April 21, 2020, his case would be presented before the Board of Aldermen.

90. On April 21, 2020, Officer Shingles' attorney, William Sessions, went to the Board of Aldermen meeting for the purpose of representing Officer Shingles; however, Officer Shingles' case was not called.

91. Officer Shingles was not afforded notice and an opportunity prior to his discharge and received no pre-termination hearing of any sort in violation of the 14th amendment.

## **DAMAGES**

Officer Shingles seeks injunctive relief to put an end to the unlawful employment practices undertaken by Defendant City of Southaven and equitable relief to include front pay. Additionally, Officer Shingles seeks compensatory damages including lost wages, lost earning capacity, emotional distress, pain and suffering, humiliation and embarrassment. He seeks punitive damages in a sufficient amount to punish and prevent the intentional and reprehensible discriminatory employment practices undertaken with reckless disregard to Officer Shingles' federally protected civil rights.

**WHEREFORE, PLAINTIFF PRAYS FOR RELIEF AS FOLLOWS:**

A. That Defendants be served with this Complaint and compelled to Answer within the time prescribed;

B. Declare that City of Southaven's acts, conduct, policies and practices are unlawful and violate 42 U.S.C.A § 1981 et seq.

C. Judgment against Defendants as their violations were willful and intentional;

D. Awarding Plaintiff liquidated damages in the amount of $500,000.00;

E. Awarding Plaintiff reasonable attorney's fees and costs and expenses;

F. Awarding Plaintiff pre and post-judgment interests;

G. Awarding Plaintiff all damages to include back pay and front pay that are available to her under the law;

H. That the Defendants be permanently enjoined from allowing such discrimination to occur in the future with respect to the treatment of any human being;

I. That at the hearing of this cause, Plaintiff be awarded such compensatory sums as will fully compensate him for the wrongful acts of Defendants, in an amount to be determined at

trial, but not less than $250,000.00. This claim includes but is not limited to claims for back pay, front pay or reinstatement, mental and emotional distress, and embarrassment and humiliation;

    J.    That at the hearing of this cause, Plaintiff be awarded such punitive damages as will punish Defendants intentional, malicious, reckless and wanton conduct and serve to deter others similarly situated from engaging in similar illegal conduct, in an amount not to exceed $1,000,000.00.

    K.    An order requiring Defendants to preserve all electronically stored information relevant to this lawsuit;

    L.    That this Court award Plaintiff all wages and other benefits, including back pay and damages, to fully compensate him for loss of earnings and fringe benefits, plus prejudgment interest, which he would have received but for the discriminatory treatment by Defendants, up to the date he acquired similar employment; and

    M.    An award of reasonable attorney fees and costs to compensate Plaintiff for having to prosecute this action against Defendants; and

    N.    All other and further legal equitable relief which he may show that he is entitled to under the circumstances.

    **PLAINTIFF DEMANDS TRIAL BY JURY**.

Respectfully Submitted,

ESKINS, KING & MARNEY, P.C.

/s/ Bradley W. Eskins
Bradley W. Eskins (104301)
Attorney for Plaintiff
200 Jefferson Ave. Ste. 1510
Memphis, TN  38103
901-578-6902
beskins@eskinsking.com