IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

DAVE W. SHINGLES, JR.                                                    PLAINTIFF

V.                                          CIVIL ACTION NO. 3:21-CV-28-SA-JMV

CITY OF SOUTHAVEN, MISSISSIPPI                                          DEFENDANT

ORDER AND MEMORANDUM OPINION

Now before the Court is the Defendant, City of Southaven, Mississippi's, Motion for Summary Judgment [34]. Having reviewed the parties' filings, as well as the applicable authorities, the Court is prepared to rule.

*Relevant Factual and Procedural Background*

Dave W. Shingles, Jr., an African American male, formerly worked as a police officer for the Southaven Police Department. After beginning his career in law enforcement in 2006 with the City of Olive Branch, Shingles began working as a police officer for Southaven in October 2014. He remained employed with Southaven until his termination on April 21, 2020.

Shingles asserts that, during his tenure in law enforcement, he always had a passion for community policing. In his Complaint [1], Shingles explains the term "community policing" as follows: "[c]ommunity policing involves officers creating bonds with the citizens in their ward on a regular basis. Officers interact with the citizens they protect in a personal way by talking to them and getting to know them." [1] at p. 3. According to Shingles, various members of the Southaven Police Department often encouraged him to actively pursue community policing.

At the time of his termination, Shingles worked on the Delta shift, which was one of the night patrol shifts—the hours being from 6:00 p.m. to 6:00 a.m. Shingles' direct supervisor was

Sergeant Hal Vanderford. Sergeant Vanderford reported to Lieutenant Brian Rosenberg who had been appointed to Lieutenant over the Delta shift about a month before Shingles' termination.

The events particularly pertinent to this case began in March 2020. Shingles was working night patrol on the night of March 29, 2020. Around midnight, while out on patrol, Shingles saw two college-aged black males playing basketball at a court beside Oak Forest Church in Southaven. Shingles stopped his vehicle, radioed dispatch and advised that he would be at Oak Forest Church talking to the two men, and then approached the basketball court.

At the time, the City of Southaven had just put in place a curfew related to the COVID-19 pandemic. Shingles approached the men to speak with them about being out after curfew. According to Shingles, he "learned that the two young men were almost through with their game of one-on-one, so he waited as they finished. After the game finished, Officer Shingles took the opportunity to speak with and mentor the two young men, discussing their lives, educations, etc." [36] at p. 4. Shingles alleges that despite being on the basketball court, he kept on his personal protective equipment and maintained six feet of social distancing as required by the Department's COVID-19 policy at the time. Shingles also states that he "had his radio on and was monitoring radio traffic" while talking with the young men. *Id*. Further, although admitting that "while they talked, each of the men intermittently dribbled a basketball[,]" Shingles says that he was not playing basketball with the two men. *Id*.

Around fifteen minutes after Shingles arrived at the basketball court, Lieutenant Rosenberg drove up to the location. As phrased by Shingles, Lieutenant Rosenberg's "sudden [appearance] at the church was highly irregular." *Id*. In his Response [36], Shingles described his interaction with Lieutenant Rosenberg as follows:

> Officer Shingles walked over to Lt. Rosenberg and Lt. Rosenberg stated that he was "coming to check on" Officer Shingles. Lt.

> Rosenberg told Officer Shingles that he (Officer Shingles) had been quiet on the radio and that he (Officer Shingles) was out with two "suspicious characters" who were both African American. . . Officer Shingles asked Lt. Rosenberg if "everything was ok", and Rosenberg answered "yes." Rosenberg never said anything about Officer Shingles intermittently bouncing a basketball or the COVID-19 policy. . . Officer Shingles had not missed a call, had told dispatch what he was doing, and had not used the term "suspicious characters" in referring to the two African American college students who were playing one-on-one basketball. Officer Shingles simply told dispatch that he was going to speak with two young men who were playing basketball after curfew.

[36] at p. 4-5 (citations omitted).

Lieutenant Rosenberg ordered Shingles to prepare a memo for his personnel file summarizing the events that transpired at the basketball court that night. Shingles prepared the memo as requested.

Another incident occurred a few days later on April 1, 2020. That night, Shingles arrested an individual for shoplifting and transported the individual to the Desoto County Jail. Despite arresting the individual, Shingles did not prepare a written report as was required by the Department's booking policy at that time. Shingles eventually prepared the report a couple days later after being reminded by his supervisor to do so.

On April 13, 2020, Shingles became aware that he was under an internal affairs investigation based upon his job performance—in particular, the investigation concerned allegations of "Neglect of Duty." Shingles met with Captain Jason Scallorn and Lieutenant Rosenberg about the initiation of the investigation. The Notice of Investigation document which was prepared at the commencement of the investigation contained the following "brief statement of particulars":

> Officer Shingles, on March 29, 2020, was observed by Lieutenant B. Rosenberg, participating in a basketball maneuvers [sic] with two other subjects, in the rear of Oak Forest Church, 7700 Getwell Road.

> On April 1, 2020, Officer Shingles failed to complete or file an incident report in association with an arrest during his tour of duty. It is alleged that Officer Shingles has shown a continual pattern of 'failure to act' as it relates to his duties and a failure to correct performance issues and omissions upon given notice of said, over an extended period of time.

[34], Ex. 1 at p. 177.

The investigation was led by internal affairs investigator Todd Mullen. Following the investigation, a "Disposition" document was prepared. The document indicated that Violation #1 (the basketball incident) was "supported," and the recommended action was termination. *See* [34], Ex. 1 at p. 178. Chief of Police Macon Moore, Captain Scallorn, and Shingles all signed the "Disposition" document. A "Disposition Summary Sheet" was attached to that document and provided the following summary:

> Officer Shingles has a pattern of behavior that is documented in over 21 different incidents from 2017-2019. The latest infraction is well documented in the Internal Affairs packet and shows a continued pattern of disregard for following rules, and completing assignments. Officer Shingles has received some form of disciplinary or counseling action from every supervisor that he has worked under on every shift and in every division that he has been assigned. These infractions are listed in the disciplinary packet for the Boards [sic] reference.

[34], Ex. 1 at p. 179.

According to Chief Moore, Mullen met with Shingles initially on April 21, 2020, to discuss the findings of the investigation. Chief Moore then met with Shingles separately and advised him that he was going to recommend Shingles' termination to the Southaven Board of Aldermen at their meeting that evening. When questioned in his deposition about the meeting with Chief Moore, Shingles admitted that it did occur, though he testified that he did not get an opportunity to explain himself during that meeting.

Chief Moore presented the termination recommendation to the Board of Aldermen that night. Although Shingles did not personally attend the meeting, he testified that his attorney at that time, William Sessions, did attend. During the meeting, consistent with Chief Moore's recommendation, the Board unanimously voted to terminate Shingles' employment with the City of Southaven.

On February 21, 2021, Shingles initiated this lawsuit by filing his Complaint [1] against the City of Southaven and Lieutenant Rosenberg (in his individual capacity). As to Southaven, Shingles asserts two claims—(1) race discrimination in violation of 42 U.S.C. § 1981; and (2) a violation of his due process rights by terminating his employment without a hearing. Shingles also alleged a state law claim for tortious interference with contract against Rosenberg individually. However, Shingles voluntarily dismissed that claim via a Stipulation of Voluntary Dismissal [33]. Thus, only the claims against Southaven remain pending. Through the present Motion [36], Southaven seeks dismissal of both claims.[1]

### Summary Judgment Standard

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and

---

[1] Southaven filed its Motion for Summary Judgment [34] on January 21, 2022. Pursuant to the applicable Local Rule, Shingles' response in opposition was therefore due to be filed by February 4, 2022. *See* L.U. Civ. R. 7(b)(4). Shingles never requested an extension of time to respond to the Motion [34] but instead filed a Response [36] on March 15, 2022—well over a month after his deadline. Southaven filed a Motion to Strike [37] the Response [36] as untimely. *See* L.U. Civ. R. 7(b)(4) ("A party must make any request for an extension of time in writing to the judge who will decide the motion."). The Court does not take lightly the failure to comply with its deadlines and the Local Rules. However, because the Motion for Summary Judgment [34] is now fully briefed, the Court will not strike the Response [36] but will instead decide this case on the merits. *See, e.g., Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 337 (5th Cir. 2017) ("The district court should construe the procedural rules with a preference towards resolving the case on the merits and avoiding any dismissal based on a technicality."). The Motion to Strike [37] is therefore DENIED.

5

upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id*. (quoting *Celotex*, 477 U.S. at 323). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting *Celotex*, 477 U.S. at 324). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalist arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

*Analysis and Discussion*

Southaven contends that summary judgment should be granted in its favor on both claims. The Court will address the claims in turn.

I.      *Race Discrimination*

In his Complaint [1], Shingles avers that he "has been the victim of unlawful discriminatory conduct in the workplace" and ultimately "suffered adverse employment actions by defendant on

the basis of his race." [1] at p. 15. He asserts that the City should be held liable pursuant to 42 U.S.C. § 1981.

The Court analyzes Section 1981 claims in the same manner as Title VII claims. *See, e.g.,* *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 386 (5th Cir. 2017) ("The analysis of discrimination claims under § 1981 is identical to the analysis of Title VII claims."); *Mengistu v. Miss. Valley State Univ.*, 2017 WL 3880319, at *2 n. 2 (N.D. Miss. Sept. 5, 2017) ("The elements of the claims under Title VII and Section 1981 are identical. We therefore evaluate both claims using the same analysis.").

In the absence of direct evidence, "the Court uses the *McDonnell Douglas* burden shifting framework to assess the sufficiency of the evidence." *Gossett v. Allegiance Specialty Hosp. of Greenville, LLC*, 2021 WL 4504694, at *3 (N.D. Miss. Oct. 1, 2021) (citing *Harville v. City of Houston*, 945 F.3d 870, 874-75 & n. 10 (5th Cir. 2019)); *see also Russell v. City of Tupelo*, 544 F. Supp. 3d 741, 754 (N.D. Miss. 2021) ("To succeed on a claim for racial discrimination under Title VII or Section 1981, a plaintiff may show a *prima facie* case either through direct evidence of discriminatory motive, or circumstantial evidence under the *McDonnell Douglas* burden-shifting framework.").

Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden to establish a *prima facie* case of discrimination. *Id*. (citing *Harville*, 945 F.3d at 875). "After the plaintiff makes out a *prima facie* case, 'the burden of production shifts to the defendant to proffer a legitimate, nondiscriminatory reason for its action.'" *Id*. (quoting *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 216 (5th Cir. 2016)). If the employer carries its burden, the *prima facie* case is dissolved, and the plaintiff must "produce substantial evidence indicating that the proffered

legitimate nondiscriminatory reason is a pretext for discrimination." *Id.* (quoting *Outley*, 840 F.3d at 216); *see also Mengistu*, 2017 WL 3880319 at *2.

Turning to the *prima facie* case, a plaintiff must show that he:

> (1) is a member of a protected class, (2) suffered an adverse employment action, (3) was qualified for his position, and (4) was replaced by someone outside of the protected class or that similarly situated employees of a different class were treated more favorably.

*Mengistu*, 2017 WL 3880319 at *2 (citing *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 345 (5th Cir. 2007)).

Here, the first three *prima facie* elements are easily satisfied for summary judgment purposes. Shingles is an African American and thus is a member of a protected class. He suffered an adverse employment action when his employment was terminated on April 21, 2020. Also, he was qualified for his position, having had approximately fourteen years of experience in law enforcement prior to his termination. Notably, Southaven makes no argument in opposition to these three elements.

Southaven does, however, attack the fourth element, specifically arguing that Shingles has not shown that any similarly situated employees of a different class were treated more favorably.[2] To establish this element, Shingles must show that he was "treated less favorably than 'other similarly situated employees who were not members of the protected class, under nearly identical circumstances.'" *Hardison v. Skinner*, 2022 WL 1136038, at *3 (5th Cir. Apr. 18, 2022) (per curiam) (quoting *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009); *Abarca v.*

---

[2] As noted above, a plaintiff may establish the fourth *prima facie* element by showing that he was replaced by someone outside the protected class *or* that he was treated less favorably than a similarly situated employee outside his protected class. *See, e.g.*, *Mengistu*, 2017 WL 3880319 at *2. In the case *sub judice*, Shingles makes no contention that he was replaced by someone outside his protected class. The Court therefore will only consider the second avenue—whether he was treated less favorably than a similarly situated employee outside his protected class.

*Metro. Transit Auth.*, 404 F.3d 938, 941 (5th Cir. 2005)). "Nearly identical circumstances" are present "when the employees being compared held the same job responsibilities, shared the same supervisors or had their employment status determined by the same person, and have essentially comparable violation histories." *Id*. (quoting *Lee*, 574 F.3d at 260). Furthermore, "the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions." *Id*. (citing *Perez v. Tex. Dep't of Crim. Just.*, 395 F.3d 206, 213 (5th Cir. 2004)) (emphasis omitted).

For his part, Shingles contends that he was "treated less favorable than his similarly situated [counterparts] regarding writeups." [36] at p. 9. He contends that he was oftentimes required by his supervisors to compose a writeup or a memo for his file related to deficiencies in his work performance and that white officers were not required to do so. He also contends that the basketball incident ultimately led to his termination and that two Officers—Officer Croy and Officer White—engaged in nearly identical conduct and were treated differently.

Southaven directs the Court's attention to a 2015 Fifth Circuit case—*Paske v. Fitzgerald*, 785 F.3d 977 (5th Cir. 2015). That case also involved allegations of racial discrimination within a police department. *Id*. The plaintiff (Paske), a white male who served as a sergeant within the Missouri City Police Department, alleged that Police Chief Joel Fitzgerald, a black male, discriminated against him. *Id*. at 980. In particular, Paske alleged that Chief Fitzgerald treated Geneane Merritt, a black female, as well as another officer, with more favor than Paske. *Id*. For the sake of brevity, the Court will not set forth the complete underlying facts of that case but does note the Fifth Circuit's articulation of the allegations and, ultimately, the lack of "nearly identical circumstances":

> Paske offers Merritt and another officer as comparators. Paske
> makes various allegations concerning Merritt, including: that she

9

> lied about the hours she worked for the City in early 2010; that she
> allowed her daughter's friends, who were known gang members, to
> stay at her house; that she was bad at her job; and that she lied when
> she requested funeral leave. Paske contends that the other officer:
> left his service revolver unsecured in his car, from which it was
> stolen; failed to report the theft; and then carried an unapproved,
> personal firearm while on duty. Paske was fired for failing to obey
> a lawful order, for refusing the drug test, for dereliction of duty and
> for conduct unbecoming an officer. Even assuming Paske's
> allegations about Merritt and the other officer are true, their
> behavior is *not even close to being "nearly identical"* to Paske's.

*Id*. at 985 (emphasis added).

This Court has previously addressed the "nearly identical circumstances" standard as well.
*Wiseman v. New Breed Logistics, Inc.*, 72 F. Supp. 3d 672, 679 (N.D. Miss. 2014). In *Wiseman*,
the plaintiff (Wiseman), an African American, was terminated from his position as a material
handler with New Breed Logistics. *Id*. The termination occurred following an incident at the work
site—specifically, "Wiseman was moving a trailer to the shipping dock when its door swung open
and crashed into the dock's receiving door[.]" *Id*. Following the incident, Wiseman was suspended
pending an investigation and was ultimately terminated. *Id*.

Claiming that the termination was based upon his race, Wiseman attempted to establish the
fourth *prima facie* element by comparing himself to a white employee (Jamison). *Id*. at 679.
Wiseman contended that Jamison was also involved in an incident with a trailer but was treated
more favorably. *Id*. This Court rejected Wiseman's argument:

> New Breed identifies key differences between Wiseman and
> Jamison. Wiseman had four years' experience with New Breed and
> was a permanent employee. Jamison, however, was never more than
> a probationary employee and had worked at New Breed for just two
> months at the time he allegedly received preferential treatment.
>
> In addition, it is undisputed that prior to their respective trailer
> accidents, Jamison had yet to receive any disciplinary counseling,
> but Wiseman had been subject to disciplinary action for three
> different incidents. Wiseman received written warnings for striking

> a pole with a forklift and later for operating a forklift without the required paperwork. Wiseman also received a final written warning and disciplinary counseling for failing to properly seal (lock) trailers parked in the facility yard. Thus, when New Breed made its decisions regarding Wiseman and Jamison, it *was not faced with essentially comparable violation histories*.

*Id*. at 680 (internal citation omitted, emphasis added).

Against this backdrop, the Court turns to Shingles' arguments. He first contends that supervisors treated him less favorably than others outside his protected class as to the writeup/memo process:

> Officer Shingles testified in his deposition that he was told by white officers that white officers, during their exit interviews, had been told that the "writeups/memos" were not used against the officer. However, these same "writeups/memos" were the basis for Officer Shingles [sic] termination.
>
> Officer Shingles testified that if he was tardy to roll call, he was required to "write up" a memo for his personnel file. However, white officers who were tardy for roll call were not written up or required to prepare a memo for their file. (Shingles dep. at 31-32). Officer Shingles testified that he would be sitting in roll call, and there would be three other officers there. During roll call white officers would come in late but were not required to prepare a "memo" for their personnel file.

[36] at p. 10.

When specifically questioned about this issue in his deposition, Shingles testified:

> **Q.** Can you – as you sit here, can you tell me – what I'm understanding you to say is other officers that were tardy were not written up?
>
> **A.** Well, that's what was – that was advised to me.
>
> **Q.** You don't – you don't know the – you don't – you haven't reviewed any personnel files to see?
>
> **A.** No, no.

> Q. Who were some of the officers that you think may have been tardy and never written up for?
>
> A. I wouldn't use the term "never."
>
> Q. Okay.
>
> A. I can't give the term "never." I can recall a co-worker: Brad Knox.
>
> Q. Any others?
>
> A. For now – it's just Brad for now.
>
> Q. And Brad Knox is a white officer?
>
> A. Yes, sir.
>
> Q. And you believe that he was not written up for tardies in the same fashion as you?
>
> A. Yes, sir. Yes, sir.
>
> Q. Anything else you want to tell me about that?
>
> A. No.

[36], Ex. 1 at p. 3-4.

In another portion of his deposition, Shingles identified another co-worker, Alex Franks, who he contended was treated more favorably as it pertains to the writeup process:

> Q. Yeah. Did – go ahead.
>
> A. But that they can't hurt your file.
>
> Then a partner of mine, Alex Franks – I recall him having some issue. I'm not – I can't remember exactly the issue, but he was told to do a memo. And I remember him telling the supervisor, which he advised me. He said, I'm not doing that memo.
>
> And he went and contacted his PBA rep.
>
> PBA rep said, Man, you ain't got to do the memo.

> So I remember contacting back – later on, I was working at the time. I said, What happened with that memo?
>
> He said, I didn't do the memo. I don't have – you don't have to do memos.
>
> I said, Really?
>
> So that's – yeah. So for me, I just follow orders. And at a certain point, yes, I felt like I was being targeted. I felt like it was harassment. But I didn't know who I could talk to. I didn't know [who] my PBA was – I didn't know who to talk to. I just follow orders.
>
> But at a certain point, it was just a pattern of this is not even – even my counterparts, they're even saying they don't have to do them. And my other counterpart is saying even a city administrator told him memos are just – it's just – it's just documents. They can't hurt you. But as we see in my file . .

[36], Ex. 1 at p. 26-27.

As these excerpts make clear, Shingles argument is in essence that the disciplinary process as a whole (or at least the writeup/memo portion of it) is administered in a discriminatory fashion. In other words, he asserts that he, as a black officer, was subjected to the writeup/memo process more frequently than officers outside of his protected class who engaged in the same conduct. In his Response [36], he argues:

> Officer Shingles testified that if he was tardy to roll call, he was required to "write up" a memo for his personnel file. However, white officers who were tardy for roll call were not written up or required to prepare a memo for their file. (Shingles dep. at 21-32). Officer Shingles testified that he would be sitting in roll call, and there would be three other officers there. During roll call white officers would come in late but were not required to prepare a "memo" for their personnel file.

[36] at p. 10.

13

Shingles specifically identified two white officers who were purportedly treated differently through the writeup/memo process. As to Knox, Shingles specifically alleges that he received no discipline for being tardy, despite the fact that Shingles did in fact receive writeups for the same offense. Shingles' disciplinary file which was attached to his deposition transcript does in fact contain documentation as to his late arrival for work. Specifically, a "Record of Conversation" document dated January 24, 2019 indicates that a work performance conference was held with Shingles, wherein he received a verbal warning "due to being late for work on numerous occasions and missing a required training session." [34], Ex. 1 at p. 132. Although Shingles does not dispute that he was late for work on occasion, his argument, consistent with his deposition testimony, is that white officers (such as Knox) were also late and did not receive this same type of discipline.

Concerning Franks, Shingles' contention is that he, as a black officer, was required to prepare memos while Franks was not. He further avers that this constitutes preferential treatment, as the resulting effect was a slimmer disciplinary file for Franks and other white officers.

On the other hand, Southaven attached to its Motion [34] an affidavit of Chief Moore, who provided the following information:

> 4. As the completed disciplinary file was turned over to me as the Chief of Police for review I not being familiar with Shingles referred to his disciplinary resume to assist me in determining the proper level of discipline to request from the Mayor and Board of Alderman [sic].

> 5. In reviewing Shingle's [sic] disciplinary resume, I was astonished at the number of reprimands that he had received over the last three years. The total number of disciplinary actions that were entered into Shingles' resume totaled 21. These entries were all for actions similar to the infractions that Shingles was written up for in this particular case. I went back and interviewed multiple supervisors who were involved in the previous disciplinary actions and all were consistent as was his history to show that previous actions taken had done little to correct his issues.

14

> 6. I have been in a law enforcement administrative position since 2007. Shingles' disciplinary resume was without question the lengthiest I have ever viewed. The 21 documented disciplinary actions from 2018 until 2020, many of which contained an element of negligence and unprofessional behavior, sustained my decision to request termination by the Mayor and Board of Alderman [sic].

[34], Ex. 3 at p. 1-2.

Thus, Southaven has come forward with evidence of a long history of violations in Shingles' personnel file. However, Shingles' disciplinary record in and of itself does not necessarily entitle Southaven to summary judgment; rather, as noted above, the question is whether he was treated less favorably than other similarly situated employees outside of his protected class. *Hardison*, 2022 WL 1136038 at *3. And if Shingles' contention as to the preferential treatment of white officers during the writeup/memo process is true, pointing only to Shingles' extensive violations would be insufficient, as it provides no basis for adequate comparison. Furthermore, the Court notes the alleged discrimination in the process as whole, which ultimately created (or helped create) the disparity in the disciplinary files of the subject employees, was not at issue in the *Paske* or *Wiseman* cases referenced above. That is a critical point of distinction in this Court's view.

At this stage, the Court has before it admissible evidence—specifically, Shingles' testimony—that he was treated less favorably than white officers in the writeup/memo process. And again, at the summary judgment stage, "[t]he Court resolves factual controversies in the non-movant Plaintiffs' favor." *Pippen v. Tronox, LLC*, 359 F. Supp. 3d 440, 443 (N.D. Miss. Jan. 14, 2019) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

Shingles also identifies Officers Phillip Croy and Tyler White as comparators. Shingles avers that, although he was terminated for allegedly playing basketball with two young men while engaged in community policing, Officers Croy and White engaged in similar conduct and received more favorable treatment.

In pertinent part, Chief Moore's affidavit provides:

> 9. In his complaint, Plaintiff mentioned Officers Phillip Croy and Tyler White. Neither of these officers have the same disciplinary history as Plaintiff. They have only 5 disciplinary incidents combined as compared to Plaintiff. Plaintiff was terminated for neglect of duty as shown by his repeated failure to comply with orders, be on time or correct his mistakes. Plaintiff was terminated to pattern of conduct [sic] over a period of years.

> 10. In addition to the lack of disciplinary history of Croy and White as compared to Plaintiff, I looked at the incident that Plaintiff says was similar. Officers Croy and White were together on foot patrol at an apartment complex on day shift and briefly stopped to throw football with some children. Plaintiff, on the other hand, stopped to [sic] at a church basketball court on private property with two adult males playing basketball while alone on night patrol. Plaintiff's conduct posed an officer safety issue as he acknowledged that he did not know the two males. Plaintiff also had asked his supervisor earlier to use his workout time playing basketball and was told not to do so.

[36], Ex. 3 at p. 1-2.

Southaven relies on Chief Moore's affidavit and contends that Officers Croy and White are not sufficiently similar for purposes of the fourth *prima facie* element. In his Response [36], Shingles asserts:

> Following the March 29, 2020, event, Defendant Rosenberg ordered Officer Shingles to prepare a "memo" for his personnel file to address and document his speaking with the two young men that night.

> In contrast, two white patrol officers, Philip [Croy] and Tyler White, were at South Park Apartments playing football with a group of people while on duty. Officers [Croy] and White missed several radio calls, and were off the radio for a considerable amount of time. Officers [Croy] and White were not disciplined for playing football and ignoring their radios while on duty.

[36] at p. 13 (internal citations omitted).

16

Comparing his basketball incident and Officers Croy and White's football incident, Shingles contends that he was treated less favorably than those two officers. The Court is cognizant of Southaven's contention (articulated in Chief Moore's affidavit) that Shingles' basketball incident is different because it occurred on private property and presented an officer safety issue. However, the Court notes that the Fifth Circuit has "made clear that 'nearly identical' is not 'synonymous with "identical."'" *Turner v. Kansas City S. Ry. Co.*, 675 F.3d 887, 893 (5th Cir. 2012) (citation omitted). The Fifth Circuit further explained that "a requirement of complete or total identity rather than near identity would be essentially insurmountable, as it would only be in the rarest of circumstances that the situations of two employees would be totally identical." *Id.* (quoting *Lee*, 574 F.3d at 260). Though not completely identical, the football incident in which Officers Croy and White engaged and Shingles' basketball incident appear, at least for purposes of summary judgment, to be sufficiently similar. As to the violation histories of Officers Croy and White, the Court notes Chief Moore's representation that those Officers' personnel files include a total of only five disciplinary infractions. However, the Court reverts back to its explanation above as to Shingles' allegations of preferential treatment in the disciplinary process as a whole, which if true certainly *could* skew those numbers.

The Fifth Circuit has recently described a plaintiff's *prima facie* burden as "very minimal." *See Owens v. Circassia Pharmaceuticals, Inc.*, --- F.4th ---, 2022 WL 1515087, at *5 (5th Cir. May 13, 2022); *see also Hardison*, 2022 WL 1136038 at *4 (Dennis, J. concurring) ("Thus, to establish a *prima facie* case, a plaintiff need only make a *very minimal showing*.") (citations and quotation marks omitted, emphasis added). The Supreme Court has also described the *prima facie* case as a "flexible evidentiary standard." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002).

Considering the above-referenced evidence and Shingles' identification of four white officers who were treated more favorably in some fashion, the Court finds that Shingles meets the applicable standard for his prima facie case, thereby precluding summary judgment. *See Hardison*, 2022 WL 1136038 at *4 (Dennis, J. concurring) (citing *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), aff'd, 553 U.S. 442 (2008)) ("All that is required for a comparator to be similarly situated is that he share 'enough common features' with the plaintiff to allow a meaningful comparison."). Southaven's request for summary judgment on Shingles' Section 1981 claim is therefore denied.[3]

II.    *Due Process*

Shingles also asserts a procedural due process claim against Southaven. On that claim, he alleges that he "had a constitutionally protected interest in his employment" and that Southaven violated his rights "by terminating him without a hearing." [1] at p. 16.

Southaven contends that this claim should be dismissed because Chief Moore met with Shingles on April 21, 2020 and notified Shingles of his intent to recommend Shingles' termination to the Board of Aldermen at the board meeting that night. In his deposition, Shingles confirmed that the meeting with Chief Moore did in fact occur. Southaven takes the position that "Chief Moore's pre-termination meeting with Plaintiff met all due process requirements." *Id*.

In his Response [36], Shingles did not in any way address Southaven's arguments as to the due process claim. This alone is a sufficient basis to dismiss that claim under this Court's precedent. *See Tubwell v. Specialized Loan Serv., LLC*, 2019 WL 1446362, at *3 (N.D. Miss. Mar. 29, 2012) (noting that the non-movant's failure to respond to the moving party's motion for

---

[3] Southaven did not seek summary judgment on the pretext issue, instead only arguing that summary judgment is appropriate as to the *prima facie* aspect. The Court therefore will go no further in the *McDonnell Douglas* analysis as this time.

summary judgment on certain claims "amounts to an abandonment of [those] claims"); *see also Scott v. Spencer Gifts, LLC*, 2015 WL 4205242, at *1 (N.D. Miss. July 10, 2015) ("In their response, Plaintiffs have made no argument and offered no proof in support of their claims of intentional infliction of emotional distress and failure to train or supervise, and thus the Court finds these theories to be abandoned."); *Sanders v. Sailormen, Inc.*, 2012 WL 663021, at *3 (N.D. Miss. Feb. 28, 2012) (collecting cases) ("Failure to address a claim results in the abandonment thereof."). Dismissal of the due process claim on the basis of abandonment is appropriate.

However, even if Shingles had not abandoned that claim, dismissal would be appropriate. To establish a procedural due process claim, the plaintiff must demonstrate (1) that he was deprived of a property interest protected by the Fourteenth Amendment, and (2) that the process attendant to the deprivation was constitutionally deficient. *McMullen v. Starkville Oktibbeha Consolidated Sch. Dist.*, 200 F. Supp. 3d 649, 654-55 (N.D. Miss. 2016) (citing *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460, 109 S. Ct. 1904, 104 L. Ed. 2d 506 (1989)) (additional citations omitted).

As to whether there was a property interest, this Court has previously explained that "[p]roperty interests do not derive from the Constitution, 'but from an independent source such as state law, a contract, or other understandings.'" *Id.* (quoting *Stem v. Gomez*, 813 F.3d 205, 210 (5th Cir. 2016) (additional quotations omitted). "For a property interest in public employment, there must be more than 'an abstract need, a desire, or a unilateral expectation to continued employment.'" *Id.* (quoting *Stem*, 813 F.3d at 210) (additional citation omitted). Under Mississippi law, "an employee is considered an at-will employee unless an express or implied contract, state law, or local ordinance indicates otherwise." *Johnson v. City of Shelby, Miss.*, 642 F. App'x 380, 383 (5th Cir. 2016) (citing *Levens v. Campbell*, 733 So.2d 753, 763 (Miss. 1999)).

Here, Shingles has not made any contention that he had a protected property interest in continued employment. In other words, he has provided nothing to indicate that his employment was anything other than an at-will employment relationship. This Court recently held that a police officer who had come forward with no documentation or other proof to establish an express or implied contract was an at-will employee. *See Adams v. City of Columbus, Miss.*, N.D. Miss. Cause No. 1:20-CV-95-SA-DAS [20] at p. 8-11. Similarly here, Shingles has not come forward with evidence, nor has he even alleged, that he was anything other than an at-will employee.

Likewise, as noted by Southaven, Shingles had an opportunity to meet with Chief Moore who explained his intent to pursue termination of Shingles' employment at the City board meeting. In his deposition, Shingles testified that his attorney was present for the board meeting. Shingles has done nothing to illustrate that the procedure was constitutionally deficient. *See*, *e.g.*, *Branch v. Carroll County, Miss.*, 2020 WL 5644929, at *4 (N.D. Miss. Sept. 22, 2020) (quoting *Cooper Indus., Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 876 F.3d 119, 128 (5th Cir. 2017)) ("At the summary judgment stage, 'while all evidence is viewed in the light most favorable to the non-movant, the non-movant must still come forward with specific facts indicating a genuine issue for trial and cannot merely rely on the allegations in the complaint.'").

Shingles' due process claim is due for dismissal on multiple grounds. Summary judgment is granted in Southaven's favor on that claim.

*Conclusion*

For the reasons set forth above, the City of Southaven's Motion for Summary Judgment [34] is GRANTED IN PART and DENIED IN PART. Shingles shall be permitted to proceed to trial on his Section 1981 claim. His procedural due process claim is dismissed *with prejudice*. Additionally, Southaven's Motion to Strike [37] is DENIED.

SO ORDERED, this the 6th day of June, 2022.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE